RICHARDSON, SECRETARY OF HEALTH, EDUCATION, AND WELFARE *v.* WRIGHT ET AL.

No. 70–161.  Argued January 13, 1972—Decided Febrary 24, 1972*

*Assistant Attorney General Gray* argued the cause for appellant in No. 70–161 and for appellee in No. 70–5211. With him on the briefs were *Solicitor General Griswold, Kathryn H. Baldwin, Wilmot R. Hastings, Edwin H. Yourman,* and *Paul Merlin.*

*Robert N. Sayler* argued the cause and filed briefs for appellees in No. 70–161 and for appellants in No. 70–5211.

Briefs of *amici curiae* in both cases were filed by *Thomas L. Fike* for the Legal Aid Society of Alameda County; by *David H. Marlin* and *Jonathan A. Weiss* for the National Council of Senior Citizens; and by *Albert C. Neimeth* for Luella H. Mills et al.  *Bernard P. Becker* and *Harvey N. Schmidt* filed a brief for Stella Van Guilder et al. as *amici curiae.*

PER CURIAM.

We noted probable jurisdiction of these appeals, 404 U. S. 819 (1971), to consider the applicability of *Gold-*

---

*Together with No. 70–5211, *Wright et al.* v. *Richardson, Secretary of Health, Education, and Welfare,* also on appeal from the same court.

*berg* v. *Kelly,* 397 U. S. 254 (1970), to the suspension and termination of disability benefit payments pursuant to § 225 of the Social Security Act, 70 Stat. 817, 42 U. S. C. § 425, and implementing regulations of the Department of Health, Education, and Welfare. Shortly before oral argument, we were advised that the Secretary had adopted new regulations, effective December 27, 1971, governing the procedures to be followed by the Social Security Administration in determining whether to suspend or terminate disability benefits. These procedures include the requirement that a recipient of benefits be given notice of a proposed suspension and the reasons therefor, plus an opportunity to submit rebuttal evidence. In light of that development, we believe that the appropriate course is to withhold judicial action pending reprocessing, under the new regulations, of the determinations here in dispute. If that process results in a determination of entitlement to disability benefits, there will be no need to consider the constitutional claim that claimants are entitled to an opportunity to make an *oral* presentation. In the context of a comprehensive complex administrative program, the administrative process must have a reasonable opportunity to evolve procedures to meet needs as they arise. Accordingly, we vacate the judgment of the District Court for the District of Columbia, 321 F. Supp. 383 (1971), with direction to that court to remand the cause to the Secretary and to retain jurisdiction for such further proceedings, if any, as may be necessary upon completion of the administrative procedure.

*Vacated and remanded.*

Mr. Justice Douglas, dissenting.

While I join Mr. Justice Brennan who reaches the merits, I add a word about the unwisdom of the policy pursued by the Court.

A three-judge district court held § 225 of the Social Security Act, 42 U. S. C. § 425, unconstitutional, insofar as it purported to authorize the Secretary of Health, Education, and Welfare to suspend the payment of social security disability benefits without giving prior notice and "an opportunity to participate" to the disability beneficiary. 321 F. Supp. 383, 386. The court remanded the cause to the Secretary for the formulation of new procedures consistent with its opinion. Judge Matthews, troubled by an implication in the majority's opinion that participation merely by way of written submissions might satisfy the majority's notions of due process, dissented "from so much of the opinion as seems to suggest that the procedural requirements of due process may be satisfied with something less than the 'opportunity' [to participate] specified in [*Goldberg* v. *Kelly*, 397 U. S. 254]." *Id.*, at 388. We noted probable jurisdiction in these cross-appeals to evaluate the opinion below in light of *Goldberg*. 404 U. S. 819.

Now, however, it is suggested that the Secretary has so far complied with the instructions of the District Court to formulate new procedures that we should remand the cases to the District Court for further proceedings in light of these new requirements. Such a course, I submit, would be a perversion of the philosophy of due process that we expressed in *Goldberg*.

Judge Matthews, below, captured the essence of *Goldberg* in her brief partial dissent:

> "In *Goldberg* the Supreme Court held that a welfare recipient, in addition to timely and adequate notice detailing the reasons for a proposed termination of benefits, must have 'an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally.' " 321 F. Supp., at 387–388.

It cannot seriously be argued that the Secretary's "new rules" comport with *Goldberg*. They may cure the notice defect, but they make no provision whatsoever for the presentation of oral testimony or the confrontation of witnesses.[1]  We noted probable jurisdiction, I thought, to determine if the difference between "welfare" payments and "disability" payments is sufficient to say that one's Fifth Amendment right to be heard may be satisfied by an opportunity to make written submissions in the latter case, although not in the former.[2]  We heard oral argument on this basis.  Because of the inadequacy of the new rules, in light of *Goldberg*, the question will remain regardless of the outcome of a remand.

I think it unseemly, needlessly to shuttle any litigant, especially an indigent, back and forth from court to court, hoping that his exhaustion of newly created remedies will somehow or other make his problem disappear and relieve us of an obligation.  No concession promising justice to the claimants has been made.  The issue of due process

---

[1] The new provisions were issued as amendments to the Disability Insurance State Manual (DISM).  DISM § 265.1D now requires state agencies to inform a beneficiary of a proposed suspension of benefits, and the reasons therefor, before it formally requests the Bureau of Disability Insurance to authorize the suspension.  The beneficiary must also be given an opportunity to submit rebuttal evidence.  *Ibid.*  But the "opportunity" contemplated by this section, and the similar provisions respecting cessation of benefits (DISM § 353.6A), encompass only written submissions.

[2] This cause, however, like *Goldberg,* "presents no question requiring our determination whether due process requires only an opportunity for written submission, or an opportunity both for written submission and oral argument, where there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues."  397 U. S., at 268 n. 15.  Disability cases, like welfare cases, invariably turn on difficult and complex resolutions of hotly disputed factual questions.  See, *e. g., Underwood* v. *Ribicoff,* 298 F. 2d 850, 851 (CA4 1962).

was properly raised and is here for decision; and all the requirements of case or controversy within the meaning of Art. III of the Constitution have been satisfied.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

I respectfully dissent. The Court justifies today's *sua sponte* action on the ground that if reprocessing under the Secretary's new regulations "results in a determination of entitlement to disability benefits, there will be no need to consider the constitutional claim that claimants are entitled to an opportunity to make an *oral* presentation." (Emphasis by the Court.) Avoidance of unnecessary constitutional decisions is certainly a preferred practice when appropriate. But that course is inappropriate, indeed irresponsible, in this instance. We will not avoid the necessity of deciding the important constitutional question presented by claimants even should they prevail upon the Secretary's reconsideration. The question is being pressed all over the country. The Secretary's brief lists no less than seven cases presenting it with respect to disability benefits and 10 cases presenting it with respect to nondisability benefits.[1]

---

[1] "The issue regarding a right to a hearing prior to suspension or termination of disability benefits is presented in a number of other cases: *Doyle* v. *Richardson* (C.A. 5, No. 31,104); *Moore* v. *Richardson* (N.D. Calif., Civ. No. C–70–2573); *Eldridge* v. *Richardson* (W.D. Va., Civ. No. 70–C–52–A) (dismissed May 6, 1971); *Dye* v. *Richardson* (W.D. Pa., Civ. No. 70–1384) (dismissed March 8, 1971); *Harvey* v. *Richardson* (W.D. Pa., Civ. No. 70–1460); *Rodriquez* v. *Finch* (D. Colo., Civ. No. C–2294) (dismissed July 1, 1971); *Olivas* v. *Secretary of HEW* (D. Colo., Civ. No. C–3262). The issue is also presented in several nondisability cases: *Anderson* v. *Finch* (N.D. Ohio, Civ. No. 70–425, decided January 15, 1971, and pending before C.A. 6, No. 71–1317); *Garofalo* v. *Richardson* (S.D.N.Y., Civ. No. 70–5133) (remanded July 16, 1971); *Lindsay* v. *Richardson*

The Secretary's new regulations permit discontinuance of disability benefits without affording beneficiaries procedural due process either in the form mandated by *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), or in the form mandated by the District Court, 321 F. Supp. 383 (DC 1971). The regulations require only that the beneficiary be informed of the proposed suspension or termination and the information upon which it is based and be given an opportunity to submit a written response before benefits are cut off.[2] This procedure does not afford the beneficiary, as *Goldberg* requires for welfare and old-age recipients, an evidentiary hearing at which he may personally appear to offer oral evidence and confront and cross-examine adverse witnesses. Nor does the procedure satisfy the requirements of due process as determined by the District Court. That court held that the beneficiary must be given not only notice but also, before he responds, a "reasonable opportunity to examine the documentary evidence" upon which the Secretary relies and, in case of conflict in the evidence, a decision by an impartial decisionmaker. The court said, however, that an evidentiary hearing and opportunity to confront adverse witnesses

---

(W.D. N.C., Civ. No. 2794); *Van Guilder* v. *Richardson* (D. Minn., Civ. No. 4–70–386); *Hopkins* v. *Richardson* (E.D. Pa., Civ. No. 71–37); *Shisslak* v. *H. E. W.* (D. Ariz., Civ. No. 71–35 TUC, decided April 9, 1971 and pending before C.A. 9, No. 71–2060); *Baker* v. *Finch* (N.D. Ga., Civ. No. 13786, decided September 13, 1971); *Corona* v. *Richardson* (N.D. Calif., Civ. No. 70–2662); *Recide* v. *Richardson* (D. Hawaii, Civ. No. 70–3426); *Mills* v. *Richardson* (N.D.N.Y., Civ. No. 71–CV–208, decided October 15, 1971)." Brief for the Secretary 8–9, n. 9.

[2] Apparently the new procedures apply only to cases involving issues of medical recovery. We are advised, however, that "[t]he Secretary is presently developing a similar termination procedure to cover terminations in cases involving a return to work but no issue of medical recovery." Supplemental Brief for the Secretary 3.

were not necessary, although "a hearing could be held" if the beneficiary "submitted some evidence that contradicts that possessed by the Administration." 321 F. Supp., at 387. Thus, under both *Goldberg* and the District Court's decision, the omissions in the Secretary's new regulations are fatal to the constitutional adequacy of the procedures. Because we may imminently be confronted with another case presenting the question, and because its resolution is vitally essential to the administration of an important Government program, today's action in avoiding decision of the constitutional question is not a responsible exercise of that practice. We gain a brief respite for ourselves while the Secretary, state agencies, and beneficiaries continue confused and uncertain. Moreover, the question has been thoroughly and ably argued and briefed on both sides, and we have the benefit of thoughtful and well-considered majority and dissenting opinions in the District Court. Today's disposition results in an unjustified waste, not only of our own all too sparse time and energies, but also of the time and energies of the three judges of the District Court who must again suspend their own heavy calendars to assemble for what can only be an empty exercise. I cannot join in the Court's abdication of our responsibility to decide this case.

Both the beneficiaries and the Secretary appeal from the District Court's judgment. The beneficiaries contend that the District Court erred in not holding that the procedure must afford an evidentiary hearing as in *Goldberg*. The Secretary contends that procedural due process requirements are satisfied by the "paper" hearing afforded by his new regulations. I agree with the beneficiaries and would therefore vacate the judgment of the District Court and remand with direction to enter a new judgment requiring the procedures held in *Goldberg* to be requisite with respect to discontinuance of welfare

and old-age benefits. See *Wheeler* v. *Montgomery*, 397 U. S. 280 (1970).

Section 225 of the Social Security Act, 42 U. S. C. § 425, provides that "[i]f the Secretary, on the basis of information obtained by or submitted to him, believes that an individual entitled to benefits . . . may have ceased to be under a disability, the Secretary may suspend the payment of benefits . . . until it is determined . . . whether or not such individual's disability has ceased or until the Secretary believes that such disability has not ceased." The District Court held the statute unconstitutional on the ground that "[t]he ex-parte suspension power granted to the Secretary by section 225 is summary adjudication that is inconsistent with the requirements of due process." 321 F. Supp., at 386.

The Secretary does not challenge that holding in this Court as applied to his now-discarded procedures. Rather, the Secretary insists that the "hearing on paper" afforded to disability beneficiaries by his new regulations is constitutionally sufficient. The Secretary does not contend that disability beneficiaries differ from welfare and old-age recipients with respect to their entitlement to benefits or the drastic consequences that may befall them if their benefits are erroneously discontinued. The only distinctions urged are that the evidence ordinarily adduced to support suspension and termination of disability benefits differs markedly from that relied upon to cut off welfare benefits and that an undue monetary and administrative burden would result if prior hearings were required. Neither distinction withstands analysis.

*First.* The Secretary points out that the decision to discontinue disability benefits is generally made upon the basis of wage reports from employers and reports of medical examinations. This evidence, in the Secretary's view, "is highly reliable and not of a type that draws into issue veracity or credibility." Brief 10.

"The basis upon which disability benefits are suspended or terminated thus differs significantly from that upon which the terminations of welfare benefits involved in [*Goldberg*] rested." *Id.,* at 25. Hence, the Secretary concludes, while procedural due process requires a pre-termination evidentiary hearing for welfare and old-age recipients, for disability beneficiaries a written presentation will suffice.

The Secretary seriously misconstrues the holding in *Goldberg.* The Court there said that "the pre-termination hearing has one function only: to produce an initial determination of the validity of the welfare department's grounds for discontinuance of payments in order to protect a recipient against an erroneous termination of his benefits." 397 U. S., at 267. The Secretary does not deny that due process safeguards fulfill the same function in disability cases. In *Goldberg,* the Court held that welfare recipients were entitled to hearings because decisions to discontinue benefits were challenged "as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Id.,* at 268. The Court expressly put aside consideration of situations "where there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues." *Id.,* at 268 n. 15. However reliable the evidence upon which a disability determination is normally based, and however rarely it involves questions of credibility and veracity, it is plain that, as with welfare and old-age determinations, the determination that an individual is or is not "disabled" will frequently depend upon the resolution of factual issues and the application of legal rules to the facts found. It is precisely for that reason that a hearing must be held.

The Secretary, of course, recognizes that disability determinations often involve factual disputes. His new

procedures, as well as the post-termination procedures already available, presumably derive from that premise. The beneficiary may file a written response presenting rebuttal evidence before his benefits are suspended or terminated; after termination, he is entitled to reconsideration, based upon written submissions, and then a *de novo* evidentiary hearing, administrative appellate review of the hearing examiner's decision, and, finally, judicial review. Nevertheless, the Secretary insists that the decision to discontinue disability benefits differs from the decision to discontinue welfare benefits because the latter "may" be based upon "personal and social situations brought to the attention of the authorities by tips, rumor or gossip." Brief 25. Yet it is irrelevant how the matter is "brought to the attention of the authorities," whether "by tips, rumor or gossip" or otherwise. The question in a welfare determination, as in a disability determination, is simply whether the recipient continues to be eligible for benefits. Nor does the Secretary make clear the relevance of "personal and social situations." The Secretary does say that "[o]ne of the recipients in [*Goldberg*], for example, had been cut off because of her alleged failure to cooperate with welfare authorities in suing her estranged husband; payments to another were terminated because of alleged drug addiction." *Ibid.* The second recipient, however, was cut off because "he refused to accept counseling and rehabilitation." 397 U. S., at 256 n. 2. Consequently, both recipients lost their benefits for refusing to cooperate with the authorities. That, however, is no distinction from disability cases, for disability benefits will also be discontinued if the beneficiary refuses to cooperate.

To support the assertion that pre-termination hearings are required in welfare cases because "credibility and veracity" are in issue, the Secretary focuses upon

certain language in *Goldberg*. He first quotes the statement that "[p]articularly where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision." *Id.*, at 269. Apart from the obvious fact that that was not an absolute statement intended to limit hearings solely to those instances, it was but one of three reasons given to demonstrate that written submissions are insufficient. The Court also said that written submissions "are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance" and that they "do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decisionmaker appears to regard as important." *Ibid.* Significantly, the Secretary does not deny that those reasons are as fully applicable to disability beneficiaries as to welfare recipients.

The Secretary also relies upon the statement, quoted in *Goldberg* from *Greene* v. *McElroy*, 360 U. S. 474, 496 (1959), that:

> "[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on *fact findings,* the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is *important* in the case of documentary evidence, it is even *more important* where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination." 397 U. S., at 270 (emphasis added).

Again, however, the statement hardly indicates that confrontation and cross-examination are available to welfare recipients only because "credibility and veracity" are in issue. An individual has those rights because *facts* are in issue, as the statement makes clear. Moreover, the Court introduced its quotation of that statement in *Goldberg* by pointing out that "[i]n almost every setting where important decisions turn on *questions of fact,* due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.,* at 269 (emphasis added). And, even assuming the validity of the novel doctrine that confrontation and cross-examination are available solely for the purpose of testing "credibility and veracity," that would not justify depriving the disability beneficiary of "an effective opportunity to defend . . . by presenting his own arguments and evidence orally." *Id.,* at 268. Finally, I see no reason to suppose, nor does the Secretary suggest any, that the "credibility and veracity" of doctors and employers can never be in issue in a disability case. Indeed, the Secretary's new regulations indicate that they may. See Disability Ins. State Manual § 353.

The premise of the Secretary's entire argument is that disability benefits are discontinued "only on the basis of an objective consideration—that the previous disability has ceased—and that conclusion rests on reliable information." Brief 26. Whether or not the information is reliable, the premise is questionable. The Secretary himself emphasizes that disability determinations require "specialized medical and vocational evaluations" and not simply the acquisition of "medical and other relevant data." *Id.,* at 28. In any event, there are three grounds, pertinent here, upon which disability can be found to have ceased. None can fairly be characterized by the term "objective."

First, cessation of disability may be found if the beneficiary refuses to cooperate with the social security authorities. 20 CFR § 404.1539 (c); see Claims Manual § 6706 (e). That judgment, of course, could be wholly subjective, as the Secretary points out with reference to welfare cases.

Second, cessation may be found if the beneficiary "has regained his ability to engage in substantial gainful activity . . . as demonstrated by work activity." 20 CFR § 404.1539 (a)(2); see Claims Manual § 6706 (a). That decision does not, as the Secretary appears to assert, rest solely "upon regular reports made by [the beneficiary's] employers to the government." Brief 25. Rather, "the work performed" by the beneficiary "may demonstrate" that he is no longer disabled, but only if it "is both substantial and gainful." "Substantial work activity involves the performance of significant physical or mental duties, or a combination of both, productive in nature." A finding of "substantial gainful activity" depends upon the nature of the work performed, the adequacy of the performance, and the special conditions, if any, of the employment, as well as an evaluation of the time spent and the amount of money earned by the beneficiary. 20 CFR §§ 404.1532–404.1534.

Third, cessation of disability may be found if the evidence establishes medical recovery. 20 CFR § 404.1539 (a)(1); see Claims Manual § 6706 (c). That decision, of course, will be based upon medical examinations, but it does not follow that it is necessarily "objective." "The function of deciding whether or not an individual is under a disability is the responsibility of the Secretary," and a medical conclusion that the beneficiary is or is not disabled "shall not be determinative of the question." 20 CFR § 404.1526. The Secretary's decision that a beneficiary's impairment "is no longer of such severity as to prevent him from engaging

in any substantial gainful activity," 20 CFR § 404.1539 (a)(1), obviously depends upon more than an "objective" medical report, for the application of the legal standard necessarily requires the exercise of judgment. And, of course, multiple conflicting medical reports are "not uncommon." *Richardson* v. *Perales,* 402 U. S. 389, 399 (1971).

The Secretary's claim for "objectivity" is even less persuasive in the situation where a beneficiary's benefits are suspended. "Benefits are suspended when information is received which indicates that the individual may no longer be under a disability." Claims Manual § 6708. Here, by definition, there has been no determination that disability has ceased.

Finally, the post-termination reversal rate for disability determinations makes the asserted "objectivity" even more doubtful. According to the Secretary's figures for 1971, 37% of the requests for reconsideration resulted in reversal of the determination that disability had ceased. Moreover, 55% of the beneficiaries who exercised their right to a hearing won reversal. While, as the Secretary says, these figures may attest to the fairness of the system, *Richardson* v. *Perales, supra,* at 410, they also appear to confirm that the Court's reference in *Goldberg* to "the welfare bureaucracy's difficulties in reaching correct decisions on eligibility," 397 U. S., at 264 n. 12, is fully applicable to the administration of the disability program.

*Second.* The Secretary also contends that affording disability beneficiaries the opportunity to participate in evidentiary hearings before discontinuance of their benefits will result in great expense and a vast disruption of the administrative system. This justification for denial of pre-termination hearings was, of course, specifically rejected in *Goldberg,* 397 U. S., at 265–266, and

the Secretary offers no new considerations to support its acceptance here.

In *Goldberg,* the Court pointed out "that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." 397 U. S., at 264 (emphasis in original). That statement applies equally to eligible disability beneficiaries, for, as the District Court noted and the Secretary does not deny, "a disability beneficiary is by definition unable to engage in substantial gainful activity and he would, therefore, be liable to sustain grievous loss while awaiting the resolution of his claim." 321 F. Supp., at 386. In view of that result, the District Court concluded that the "fiscal and administrative expenses to the government, whatever their magnitude, are insufficient justification considering the crippling blow that could be dealt to an individual in these circumstances." *Ibid.* The Secretary's response is simply to stress the magnitude of the burden.

Here, as in *Goldberg,* "[t]he requirement of a prior hearing doubtless involves some greater expense." 397 U. S., at 266. The Secretary points out that current procedures include a two-step determination of disability: first by the state agency, after a district office of the Social Security Administration has conducted a disability investigation, and then, on review of the state agency's determination, by the Administration's Bureau of Disability Insurance, which is located in Baltimore, Maryland.[3] Thus, the Secretary says, a prior hearing "either would require the beneficiary to travel great distances or would necessitate that State or federal officials travel to the area in which the beneficiary resides,

---

[3] The Bureau cannot reverse a state agency's finding that disability has ceased, although it can require reconsideration by the agency. 42 U. S. C. § 421 (c); 20 CFR § 404.1520 (c); Claims Manual § 6701 (c); see Brief for the Secretary 11–12, 17.

neither of which is practical." Brief 28–29. "Nor could the decision-making function be turned over to the Administration's district offices, which are located conveniently to the beneficiaries, without staffing them with individuals qualified to make the necessary medical and vocational judgment." *Id.*, at 29. Hence, the Secretary concludes, prior hearings "would require massive restructuring of the existing administrative adjudicative process." *Id.*, at 27.

Except for bald assertion, the Secretary offers nothing to indicate that any great burden upon the system would result if the state agencies conducted the hearings. Moreover, the Secretary omits even to mention the existence of the current post-termination hearing procedures. See 20 CFR §§ 404.917–404.941. It is reasonable to assume that the only "restructuring" necessary would be a change in the timing of the hearings. That was apparently the method by which the Secretary required the States to comply with *Goldberg* in the administration of various other social security programs, see 45 CFR § 205.10, 36 Fed. Reg. 3034–3035, and it would seem to be an equally available response here. While the administration of the disability program to provide prior hearings may involve "some greater expense," as the Court noted in *Goldberg,* 397 U. S., at 266, that expense should not be exaggerated in order to deprive disability beneficiaries of their right to "rudimentary due process," *id.*, at 267.

The Secretary also claims that the requirement of prior hearings "would result in losses to the Social Security Trust Fund of nearly $16 million per year for disability cases and still greater sums when all Title II programs are considered." Brief 10. This conclusion does not follow from the facts the Secretary presents.

As to the disability program, the Secretary says that in 1971 there were 38,000 determinations that disability

had ceased and that the average monthly benefit in those cases was $207. If, to provide prior hearings, terminations were delayed for two months, the Secretary says, the cost in benefits paid pending the hearings would approach $16 million. It is immediately apparent that this figure is grossly inflated.

First, this figure depends upon the unwarranted assumption that all beneficiaries will demand a prior hearing. The Secretary suggests no reason to suppose that would happen. In fact, while there were 38,000 disability cessations in 1971, there were only 10,941 requests for reconsideration, and although 6,885 cessations were affirmed on reconsideration, there were only 2,330 requests for hearings. These post-termination procedures, of course, were utilized by beneficiaries who could not present their views before termination. Under the new regulations, affording notice and the opportunity to respond in writing before termination, it may well be that even fewer beneficiaries will demand hearings. In any event, experience in the welfare area has not demonstrated that recipients abuse their right to pre-termination hearings, and the Secretary does not claim that disability beneficiaries will do so.

Second, the $16 million figure requires not only that all 38,000 beneficiaries request prior hearings, but also that they all lose. Yet, as noted above, 37% of the reconsiderations on written submissions and 55% of the post-termination hearings in 1971 resulted in reversal. The Secretary does not claim, nor is it conceivable, that in every case a prior hearing would uphold the initial determination that disability had ceased.

Third, not only must every beneficiary request a prior hearing and every hearing affirm cessation of disability, it must also be true, to reach the $16 million figure, that the Secretary will be unable to recover any of the benefits paid to beneficiaries pending the hearings. That result

is unlikely. Section 204 (a)(1) of the Act, 42 U. S. C. § 404 (a)(1); see 20 CFR §§ 404.501–404.502, directs the Secretary, if he finds that there has been an overpayment, to require a refund from the beneficiary or to decrease any future benefits to which he may be entitled. Thus, if the beneficiary is not "disabled," he presumably can engage in "substantial gainful activity," and the Secretary may well secure a refund. If, on the other hand, the case is a close one and the beneficiary is later found to be "disabled" again, the Secretary may reduce his benefits. Furthermore, § 204 (b), 42 U. S. C. § 404 (b); see 20 CFR §§ 404.506–404.509, directs the Secretary not to require a refund or decrease benefits if the beneficiary "is without fault" and a refund or decrease "would defeat the purpose of" the Act or "would be against equity and good conscience." The Secretary's duty to waive claims for excess payments may well apply in many termination cases, particularly where the beneficiary is judgment proof. See 20 CFR § 404.508. Obviously, there is no loss to the social security fund if benefits paid to an ineligible beneficiary pending a hearing are subject to statutory waiver.

Fourth, the $16 million figure depends upon the stated premise that the requirement of a hearing would cause a two-month delay in the termination of benefits. The Secretary does not explain why he chose that time period. Under the new regulations, a beneficiary receives notice of the proposed discontinuance, is informed of the information upon which it is based, and is given the opportunity to submit a written response presenting rebuttal evidence. Only then is the disability determination made. It is difficult to believe that it would require another two months just to provide a hearing.

Finally, under § 223 (a)(1) of the Act, 42 U. S. C. § 423 (a)(1); see Claims Manual § 6707, benefits must be paid for two months after the month in which disa-

bility ceases. The $16 million figure depends upon the unwarranted assumption that all terminations occur at least two months after disability is found to have ceased. In this case, for example, the state agency determined that plaintiff Atkins' disability ceased in January. The Bureau of Disability Insurance approved that determination and on February 3 informed Atkins that his benefits would be terminated at the end of March. Thus, even assuming a two-month delay for a hearing, there would be no cost whatever to the trust fund.

Viewing Title II programs as a whole, the Secretary points out that there were nearly three million terminations of benefits in 1969. The vast majority of these terminations were for death, attainment of a certain age, and so forth, but the Secretary asserts that apart from those cases there were 515,189 terminations that would have been affected by the requirement of a prior hearing. That number, however, includes terminations based upon a student's leaving school, a change in a beneficiary's marital status, and the death or adoption of a child. Without those cases, the number drops to 186,035. Moreover, even this number includes disability terminations and the terminations of dependents based thereon. Putting aside those cases, the total appears to be somewhat closer to 100,000. While that is a substantial number of terminations, the Secretary does not indicate what issues are involved in making the decisions. As noted above, prior evidentiary hearings are necessary in disability cases because factual disputes exist. They may exist to a far lesser extent in other programs. Moreover, to whatever extent they do exist, the objections to the Secretary's inflated cost figure for disability terminations would seem to apply equally to nondisability terminations. In any event, the Secretary has simply provided the bare number of terminations, with no further information, and it

is inappropriate, if not impossible, to decide what effect requiring prior hearings in disability cases will have on nondisability cases.

I do not deny that prior hearings will entail some additional administrative burdens and expense. Administrative fairness usually does. But the Secretary "is not without weapons to minimize these increased costs." *Goldberg* v. *Kelly,* 397 U. S., at 266. Despite the Secretary's protestations to the contrary, I believe that in the disability, as in the welfare, area "[m]uch of the drain on fiscal and administrative resources can be reduced by developing procedures for prompt pretermination hearings and by skillful use of personnel and facilities." *Ibid.* The Court's conclusion on this point in *Goldberg* is fully applicable here:

> "Indeed, the very provision for a post-termination evidentiary hearing . . . is itself cogent evidence that the State recognizes the primacy of the public interest in correct eligibility determinations and therefore in the provision of procedural safeguards. Thus, the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens." *Ibid.*

My answers to the Secretary's contentions are also the reasons I disagree with the majority of the District Court and agree with the dissenting judge. I would therefore vacate the judgment of the District Court and remand with direction to enter a new judgment requiring that disability benefits not be discontinued until the beneficiary has been afforded procedural due process in the form mandated by *Goldberg* with respect to discontinuance of welfare and old-age benefits.