Leo **BRAMSEN** and Marvin Welfeld, individually and as Trustees for themselves and the limited partners of Chiglades Farm, Ltd. Plaintiffs,

v.

Clifford **HARDIN**, Secretary of Agriculture of the United States, et al., Defendants.

No. 71–837–Civ.

United States District Court,
S. D. Florida.

Aug. 1, 1972.

Nathan Lewin and Robert D. McLean, of Miller, Cassidy, Larroca & Lewin, Washington, D. C., and by Gong & Storace, Miami, Fla., for plaintiffs.

M. W. Wells, Maguire, Voorhis & Wells, Orlando, Fla., L. Patrick Gray, III, Asst. Atty. Gen., U. S. Department of Justice, Washington, D. C., and Rob-

ert Silverstein, Asst. U. S. Atty., Miami, Fla., for defendants.

## SUMMARY JUDGMENT

FULTON, Chief Judge.

This cause came before the Court upon a motion to dismiss or in the alternative for summary judgment filed by defendants Clifford Hardin and Floyd Hedlund and a motion to dismiss filed by defendant A. J. Sullivan. Plaintiffs admit that there is no genuine issue of material fact and have also moved for summary judgment. The Court heard argument of counsel and has since received and studied the briefs submitted by counsel.

The origin of this case is a ruling by the Florida Celery Committee which Committee is organized under Marketing Order 967, 7 C.F.R. § 967.130ff. promulgated by the Department of Agriculture pursuant to the authority of 7 U.S.C. §§ 601–674. The Florida Celery Committee and a Hearing Examiner of the Department of Agriculture conducted a Hearing and made a ruling which was appealed to the Secretary of Agriculture, by whom the decision was affirmed. Plaintiffs have exhausted their administrative remedies.

## JURISDICTION

The Court's jurisdiction is invoked under 28 U.S.C. § 1331(a), general federal question; 28 U.S.C. § 1361, actions to compel an officer of the United States to perform his duty; 5 U.S.C. §§ 701 et seq., permitting judicial review of administrative agency rulings; 15 U.S.C. § 4, anti-trust jurisdiction.

Plaintiffs claim that they are entitled to a base quantity for the production of celery presently belonging to defendant A. J. Sullivan of Florida, Inc., or that they are entitled to the issuance of a base quantity by the Florida Celery Committee; or that Marketing Order No. 967 which provides for the selection of The Florida Celery Committee, is unconstitutional; or that Marketing Order No. 967 is being administered unconstitutionally.

■ None of the parties have requested that the Court convene a Three-Judge Court, nor is that necessary in this case even though the constitutionality of a federal regulation has been called into question. A challenge of the constitutionality of an administrative regulation is not to be considered an attack on an Act of Congress as applied, so as to require hearing by a Three-Judge Court. Sardino v. Federal Reserve Bank of N. Y., 361 F.2d 106 (2d Cir. 1966), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130.

## FACTS

The facts in this case are not disputed. A detailed and excellent summary of the facts may be found in the Secretary's review of the committee's determination, dated September 10, 1970, document # 25, U.S.D.A. Administrative Record, which has been made a part of the record of this cause. There is, therefore, no need to restate the facts exhaustively.

Leo Bramson and Marvin Welfeld, as general partners, joined with eleven limited partners to form Chiglades Farm, Ltd., for the purpose of farming celery and other vegetables in Florida. On October 29, 1962, Chiglades entered into a joint venture with A. J. Sullivan of Florida, Inc. whose major shareholder was A. J. Sullivan. Mr. Sullivan was the possessor of a base quantity issued by the Florida Department of Agriculture. The joint venture was or became engaged in celery production.

The Florida Statute regulating the production of celery was held unconstitutional as violating the Florida Constitution by the Florida Supreme Court, Rabin v. Conner, 174 So.2d 721 (1965). The United States Department of Agriculture promulgated Agricultural Marketing Order No. 967, which, as amended, continues to regulate and control the marketing of celery in Florida. Agriculture Marketing Order No. 967 (hereinafter called Order 967) establishes the

Florida Celery Committee to administer the provisions of the Order and to make recommendations to the Secretary of Agriculture regarding limitations on the marketing of the Florida celery. Under that Order the Florida Celery Committee members are elected annually by Florida celery producers.

In order to produce celery in Florida, producers were required to possess a base quantity issued by the Florida Celery Committee. The Committee was to issue base quantities on the following basis:

1. To applicants with a prior history of celery production:
   (a) An amount of the greatest number of crates of celery sold by or for him during any one of production seasons 1961–62 through 1964–65; or
   (b) An amount derived by computing the average of sales by or for him for any two of the seven production seasons 1958–59 through 1964–65.

2. For producers with no prior history during seasons 1958–59 through 1964–65, or for those whose sales were not representative of present commitments, a base quantity could be issued based upon commitments, so long as they were, prior to September 30, 1965, firm and substantial and the producer actually engaged in celery production before that date.

When the Florida Regulatory Scheme was held to be unconstitutional by the Supreme Court of Florida, Rabin v. Conner, *supra,* Chiglades Farm, Ltd. (hereinafter referred to as Chiglades) and A. J. Sullivan of Florida, Inc. (hereinafter referred to as Sullivan, Inc.) entered into a new joint venture agreement for the production of celery with Sullivan, Inc. to apply for a base quantity as required by Order No. 967. Sullivan, Inc., applied for and received a base quantity, and the joint venture continued to produce celery, which was handled by a Coop which is known as Pioneer Grower

Cooperative. The joint venture was terminated sometime in June, 1967, after the death of A. J. Sullivan. Leo Bramson and Marvin Welfeld, the general partners of Chiglades then discovered that E. A. McCabe, one of Chiglades limited partners, and an officer of both Pioneer Land Co. and Pioneer Growers Cooperative and an employee of the joint venture, was now the owner or major stockholder of Sullivan, Inc. The joint venture leased its farm land from Pioneer Land Company and handled its celery through Pioneer Growers Co-operative.

After the joint venture was terminated, Chiglades found that it could no longer grow celery because the base quantity was issued in the name of Sullivan, Inc. Chiglades made repeated attempts to obtain a base quantity from the Florida Celery Committee, unsuccessfully. Chiglades contends that it was entitled to the base quantity presently owned by Sullivan, Inc., or in the alternative is entitled to the issuance of a new base quantity.

## SCOPE OF REVIEW

■■ Since this action comes to the Court for review of an administrative decision made by the Secretary of Agriculture, the scope of the Court's review is limited by 5 U.S.C. § 706. Hence, as to all findings of fact, the decision of the Secretary must stand if it is supported by substantial evidence, 5 U.S.C. § 706(2) (E); Watson v. Gulf Stevedore Corp., 5 Cir., 400 F.2d 649, reh. denied Young & Co. v. Shea, 404 F.2d 1059 (5th Cir. 1968), cert. denied 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755. The facts giving rise to the controversy are, however, uncontested. It is the responsibility of the Court alone

> to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. 5 U.S.C. § 706.

It would appear then that the Court's authority is clear-cut. But

[t]here is no certain standard for distinguishing "questions of law" from "questions of fact," and great difficulty and diversity has been met in the application of the law—fact test . . . . 2 Am.Jur.2d Administrative Law § 618.

This Court is confronted with just that problem. Since the facts themselves are undisputed, a major question is whether this reviewing court may or should *de novo* find and apply the facts to Marketing Order 967 or whether this Court should also rely upon the substantial evidence test in the application of the facts to the regulation. The Supreme Court in reviewing a decision by the Securities Exchange Commission upheld the findings of the S.E.C. as a matter of law when such decision was based upon substantial evidence and was consistent with the authority granted by Congress, Niagara Hudson Power Corp. v. Leventritt, 340 U.S. 336, 71 S.Ct. 341, 95 L. Ed. 319 (1951). To create the standard of substantial evidence, and then to limit the standard to mere evidentiary and credibility choices without accepting the same standard in determining the application of those facts to the regulation being administered appears to defeat the intent of Congress. The substantial evidence test has therefore been construed broadly.

The term "substantial evidence" in particular has become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court. This standard goes to the reasonableness of what the agency did *on the basis of the evidence before it* . . . . United States v. Carlo Bianchi & Co., 373 U. S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

The Court, in the case sub judice, will utilize the standard of "substantial evidence" as expanded by *Bianchi*. The standard for review as to the constitutionality of the regulation will be discussed post (Is Order 967 unconstitutional on its face).

ARE PLAINTIFFS ENTITLED TO THE BASE QUANTITY PRESENTLY POSSESSED BY DEFENDANT SULLIVAN, INC.

In deciding this issue, the Court will rely upon the findings of fact and the applications of those facts to Order 967 as determined by the Secretary of Agriculture, provided that such determination was rendered on the basis of substantial evidence.

The facts which would tend to substantiate Sullivan, Inc.'s claim to the base quantity are the following:

1. Sullivan, Inc., possessed a base quantity under the Florida regulation which was subsequently held unconstitutional.

2. A. J. Sullivan had a long history as a producer of celery in Florida.

3. The payroll bank account of the joint venture was in Sullivan, Inc.'s name, but all money deposited in it came from the account maintained by the joint venture.

4. Pioneer Growers Cooperative, which was the handler for the celery grown by the joint venture maintained its accounts only in the name of Sullivan, Inc., and made payments directly to Sullivan, Inc. It should be borne in mind, however, that Pioneer Growers Cooperative was aware that it was, in effect handling celery for the joint venture, since E. A. McCabe was an officer of Pioneer Growers Cooperative, and was also an officer of Pioneer Land Co. which leased the land to Chiglades for the purpose of growing celery under a joint venture agreement with Sullivan, Inc. And although money was paid directly to Sullivan, Inc., it was then transferred into the account maintained by the joint venture for distribution.

5. When Order No. 967 was first promulgated, it was Sullivan, Inc., and not Chiglades nor the joint

venture that made application to the Florida Celery Committee for a base quantity.

6. The joint venture agreement provided that Sullivan, Inc. was to obtain a base quantity, and no mention was made as to a base quantity being taken in the name of or owned by the joint venture.

Chiglades also presents strong evidence that it is entitled to the base quantity presently possessed by Sullivan, Inc., as follows:

1. Chiglades was the dominent contributor to the joint venture and was entitled to a substantially greater share of the profits than Sullivan, Inc.,

2. All the land used for the production of celery was leased by Chiglades from Pioneer Land Co.;

3. All initial funds for operation of the joint venture were supplied by Chiglades;

4. Sullivan, Inc., originally supplied the equipment, but Chiglades was to be responsible for all additional equipment needed. After A. J. Sullivan's death, Chiglades purchased all the equipment from his estate; and so Chiglades eventually owned all the farming equipment;

5. All losses incurred by the joint venture were to be borne in full by Chiglades. The 1962 agreement provided that profits were to be divided 80 per cent to Chiglades and 20 per cent to Sullivan, Inc. The 1965 agreement divided profits 92½ percent to Chiglades and 7½ per cent to Sullivan, Inc. A. J. Sullivan was to assign all his shares in Sullivan, Inc. to Chiglades as a pledge for his performance under the joint venture agreement, but he never did so;

6. Chiglades purchased the celery seed beds from S & W Farms.

Chiglades in its memorandum of law argues that it qualifies as a producer of celery according to the provisions of Order 967.37 and is entitled to the issuance of a base quantity. However, this statement totally ignores the fact that Chiglades did not apply for a base quantity for itself in 1965, and the base quantity legally belonged exclusively to Sullivan, Inc., rather than to the joint venture. Sullivan, Inc., applied for and received the quota in its own name and not as or for the joint venture. It is futile and needless at this point to decide whether Chiglades rather than Sullivan, Inc. would have been entitled to the initial issuance of the base quantity in 1965, if application was made therefor.

On the basis of these facts, the Court cannot say that the Secretary of Agriculture's decision in favor of Sullivan, Inc. and against Chiglades as to ownership of the base quantity in question is arbitrary or capricious or not supported by substantial evidence. Lewes Dairy, Inc. v. Freeman, 401 F.2d 308 (3d Cir. 1968). Freeman v. Hygeia Dairy Co., 326 F.2d 271 (373) (5th Cir. 1964).

ARE PLAINTIFFS ENTITLED TO THE ISSUANCE OF A NEW BASE QUANTITY?

Assuming the constitutional validity of Order 967, Chiglades seeks reversal of the Secretary's determination that it is not entitled to the issuance of a new base quantity from the Florida Celery Committee. Order 967.37(d) (1) provides:

Each marketing season the Committee, with approval of the Secretary, may set aside a reserve for persons who request an increase in their Base Quantities or who have no Base

Since the promulgation of Order 967, no "Reserve" has been established by the Florida Celery Committee.

Order 967.36(a) establishing a total marketable quantity, provides that the

committee first determine the demand for celery and then set an annual marketable quantity, which is the total amount all the celery producers are permitted to produce. Each producer is allotted a marketable quantity based upon his base quantity. Since the Committee was established, the marketable quantities promulgated have never equalled the total amount of outstanding base quantities. In other words, the amount of celery the committee permitted to be produced was always less than the total amount of celery each producer could produce on the basis of the base quantity he possessed. It was upon this reasoning that the Florida Celery Committee refused to establish a "Reserve" for the issuance of new base quantities. Since present and past demand for celery has been limited, an increase in the total base quantities for the industry is currently unwarranted.

The plaintiffs have not argued that the present demand for celery exceeds the present supply; in fact, there is considerable evidence to the contrary. And this Court is not prepared to substitute its judgment concerning the marketing conditions of celery for that of the Florida Celery Committee and the Secretary of Agriculture.

## DOES ORDER 967 AS FORMULATED OR AS ADMINISTERED OPERATE IN RESTRAINT OF TRADE?

Chiglades contends that Order 967 as formulated or as administered operates in restraint of trade in the production and marketing of celery by excluding new farmers from the market and authorizing present producers to limit total production for their own benefit. Since its inception, The Florida Celery Committee has failed to establish a reserve for the increase of producers' base quantities or the issuance of new base quantities.

All marketing agreements under Chapter 26 of Title 7 are exempt from anti-trust laws. The Secretary of Agriculture is given permission to enter into marketing agreements with handlers, producers, etc. and

> The making of any such agreement shall not be held to be in violation of any of the anti-trust laws of the United States, and any such agreement shall be deemed to be lawful. 7 U.S.C. § 608b.

Additionally, 7 U.S.C. § 608c(6) specifically authorizes the Secretary to impose limitations and allotments on the handling of certain agricultural products. The declaration of policy as enunciated by 7 U.S.C. § 602 is to create marketing standards which provide for the orderly flow of farm products to the market place for the protection of the farmer and the consumer. Since the primary purpose of the Act is regulation and limitation, anti-trust immunity complements its policy.

Chiglades maintains however, that insofar as the Florida Celery Committee exceeded its authority, or insofar as Order 967 exceeds the authority of 7 U.S.C. § 608c, anti-trust immunity no longer attaches, Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). As Chiglades itself admits, this argument is circular. If the Florida Celery Committee has acted beyond the authority granted by Order 967 or if Order 967 exceeds the authority granted by Congress to the Secretary, on that basis (and not anti-trust violations) the decision of the Secretary must fall.

■ Chiglades also contends, however, that the Secretary had an affirmative duty to consider anti-trust implications by determining whether the anticompetitive effects of Order 967 are justified by public need. Carnation Co. v. Pacific Westbound Conference, *supra* and Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968) construed the Shipping Act of 1916 and held that only limited immunity from the anti-trust laws was provided for in the Act and the Federal Maritime Commission's own formula of

"public interest" was the proper standard. These cases are distinguishable from the case at bar. The anti-trust exemption provided by 7 U.S.C. § 608b is clear, unequivocal and unlimited. No prior determination by the Secretary of possible anti-competitive effects is required. Order 967 is thus exempt from the anti-trust laws.

## IS ORDER 967 INVALID BECAUSE IT EXCEEDS THE AUTHORITY GRANTED TO THE SECRETARY BY CONGRESS?

■ The Secretary of Agriculture's authority is derived from 7 U.S.C. § 608c which provides, in part:

> The Secretary of Agriculture shall, subject to the provisions of this section, issue . . . orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this chapter as "handlers."

Two categories of persons are specifically exempt from the Act: retailers and producers.

> No order issued under this chapter shall be applicable to any producer in his capacity as a producer. 7 U.S.C. § 608c (13) (B).

No one questions the fact that Chiglades is a producer of celery who is unable to grow its product because it lacks the requisite base quantity. It would appear, therefore, that Order 967 is operating to regulate producers in their capacity as producers, which authority is particularly circumscribed by 7 U.S.C. § 608c(13) (B).

Producers are limited by the Secretary's authority to issue orders regulating the amount of each product

> which each handler may purchase from or handle on behalf of any and all producers thereof, during any spec-

ified period or periods, under a uniform rule based upon the amounts sold by such producers in such prior period as the Secretary determines to be representative . . . to the end that the total quantity thereof to be purchased, or handled during any specified period or periods shall be apportioned equitably among producers. 7 U.S.C. § 608c(6) (B).

When the Secretary formulates a rule based upon prior production history as to the amount each handler may handle from each producer a scheme of quotas arises whereby the producer is as regulated as a handler. A producer, totally exempt *as a producer,* by virtue of § 608c(13) (B) nevertheless endures the ultimate form of regulation, being unable to grow his product because the law deprives him of his way to market. In this regard, the § 608c appears to be self-contradictory.

The apparent contradiction vanishes, however, when it is recalled that § 608c does not actually regulate producers *in their capacity as producers.* No mention is made or limitation provided upon the amount of land they may till, the fertilizer which is used, or any other means producers utilize as producers. They are only regulated with respect to their relationship with handlers. This regulation, while indirect, is totally effective in the determination of whether there is a market for the producer's product. Therefore, direct controls are not necessary to limit a producer's agricultural yield.

The next question to be decided is whether the scheme of base quantities put into effect by Order 967 provides an apportionment "equitably among producers." If it does not, then in this regard, Order 967 has failed to comply with the requirements of § 608c.

■ § 967.39 provides that producers of celery, upon the approval of The Florida Celery Committee may transfer all or part of both their base quantities and

marketable allotments. Chiglades contends that since base quantities are treated as freely alienable property rights in this regard, Order 967 exceeds the authority granted by Congress to the Secretary of Agriculture.

7 U.S.C. § 608c(5) (B) specifically regulating the handling of milk and milk products permits:

> Bases allocated to producers under this clause (f) may be transferable under an order on such terms and conditions, including those which will prevent bases taking on an unreasonable value, as are prescribed in the order by the Secretary of Agriculture.

The transfers made thereof are to be utilized to alleviate "hardship and inequity among producers" and for the entry of new producers.

There is no such transfer provision or limitation affecting celery. Since Congress was aware of the problem of transfer, as evidenced by 7 U.S.C. § 608c(5) (B) concerning milk bases, we must assume that the absence of applying such limitation upon other commodities was deliberate. In this respect therefore, Order 967 does not exceed the authority granted by Congress.

■ It must be borne in mind that at the time that base quantities were originally allocated under Order 967, they were apportioned "equitably among producers." All those who had produced celery were permitted to apply for the issuance of a base quantity (§ 967.37) and those producers who "had made firm and substantial commitments for the production of celery" were also permitted to apply, so that the quotas issued would be "equitable to all producers," (§ 967, 37(b) (2)). Because Chiglades failed to apply for the issuance of a base quantity in its own name either as an old producer or as a producer with firm and substantial commitments for the production of celery, but rather acted in such a manner as to clearly imply that Sullivan, Inc. was to apply for and receive the base quantity, Chiglades cannot at this stage of events complain that base quantities were not apportioned equally among producers.

## IS ORDER 967 UNCONSTITUTIONAL?

Chiglades has not attacked the constitutionality of an Act of Congress (see Jurisdiction, *supra*), and the Court has already held that Order 967 does not exceed the scope of authority granted by Congress (*supra*). Neither is Chiglades claiming it was denied procedural due process. But Chiglades does state that since the Florida Supreme Court held that the Florida Celery and Sweet Corn Marketing Law was unconstitutional, Rabin v. Conner, 174 So.2d 721 (Fla. 1965) and since that statute was substantially similar to Order 967, the federal regulation should also be declared unconstitutional.

Order 967 was designed to fill the vacuum left after the Florida statute was held void, and sought to accomplish the same purpose: the limitation of the amount of celery to be marketed. Basically, the Florida Statute provided that:

> The celery segment of the agricultural industry in Florida is authorized to be accomplished, not by regulating the quantity of celery which may be produced, i. e., grown, but rather by controlling the quantity which may be marketed, i. e. placed in intrastate commerce, in the state in any prescribed period. This control may be exercised in one or more of three ways. First, the marketing order may prescribe the number of crates that each producer or grower may harvest and sell to or have sold by a handler. Second, it may prescribe the number of crates that each handler may buy from or handle for the producers. Third, it may prescribe the number of crates that each handler may sell, distribute, or handle in intrastate commerce, i. e., place in the "primary channel of trade." *Ibid*, p. 723.

New producers could acquire a permanent base quantity either by purchasing an existing one or by obtaining and op-

erating under a temporary permit for three years. In the event that the latter method was utilized, the new producer was limited to a maximum allocation of 48,190 crates.

■ Unlike the limitations imposed upon the Court in reviewing matters of fact, the Court is unlimited in its power to determine or pass on the constitutionality of a federal regulation, Baltimore & Ohio Railroad Co. v. U. S., 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209 (1936); St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L. Ed. 1033 (1936); Ohio Valley Water Co. v. Ben Avon, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908 (1934).

Although this Court is not bound by Florida law in this action, nevertheless, the Court deems it important to carefully consider the opinions of the Florida Supreme Court, and in this instance, particularly that Court's holding in Rabin v. Conner. We have already seen that Florida Celery and Sweet Corn Marketing Law is so similar to Order 967 both in its methods and ultimate purpose that a careful examination of that opinion would be relevant here.

■ The Florida Supreme Court held that public policy in this instance did not necessitate a rigidly controlled monopoly. Since Order 967 has been accorded immunity from anti-trust laws (*supra*) this argument need not concern us. The crux of the decision, however, was that new producers were arbitrarily discriminated against.

It is inescapable that the effect of the marketing order is to draw an unjust and discriminatory distinction between those who were producers during the representative period and those who were not. Such a classification, for which we can find no justification in any legitimate public policy, amounts to an arbitrary exercise of the state's police power so as to constitute a taking of property without due process of law and a denial of equal protection of the law. So

viewed, the marketing order is violative of Sections 1 and 12, Declaration of Rights, Florida Constitution and the Fourteenth Amendment to the United States Constitution.

7 U.S.C. § 608c(6) specifically authorizes such discrimination.

[O]rders issued pursuant to this section shall contain one or more of the following terms and conditions, and . . . no others . . . . .

(B) Allotting, or providing methods for allotting, the amount of such commodity or product . . . which each handler may purchase from or handle on behalf of any and all producers thereof . . . under a uniform rule based upon the amounts sold by such producers in such prior period as the Secretary determines to be representative . . . to the end that the total quantity thereof to be purchased, or handled during any specified period or periods shall be apportioned equitably among producers.

Again, the Court must find that Order 967 is within the scope of authority permitted by 7 U.S.C. § 608c.

. . . In the context of a comprehensive complex administrative program, the administrative process must have a reasonable opportunity to evolve procedures to meet the needs as they arise . . . . Richardson v. Wright, 405 U.S. 208, 92 S.Ct. 788, 31 L.Ed.2d 151.

The Court declines to pass upon the constitutionality of 7 U.S.C. § 608c because it lacks jurisdiction to do so (*supra*) and because the constitutionality of that statute has not been attacked.

## IS THE COMPOSITION OF THE FLORIDA CELERY COMMITTEE SUCH AS TO DEPRIVE PLAINTIFFS OF DUE PROCESS?

■ The Florida Celery Committee is composed of producers and handlers (or their employees) of celery nominated

by producers and approved by the Secretary (§§ 967.26, 967.27). As producers and handlers of celery themselves, there can be little doubt that their motivation, at least in part, stems from self-interest. Assuming that this Committee had complete and unbridled control over celery production in Florida, Chiglades' contention that it was denied due process would possibly be justified.

But this is not the case. It is the Secretary of Agriculture:

1. Who actually selects committee members. § 967.32.

2. To whom recommendations and complaints are made. § 967.30.

3. Who limits the total celery to be handled during a marketing season. §§ 967.36, 967.38.

4. Who sets aside a reserve for those persons who desire to increase their base quantity or who have no base quantity. § 967.37.

5. Who issues other regulations to effectuate the policy of the marketing order.

6. Who hears and passes on all appeals from orders of the Florida Celery Committee.

The Secretary thereby regulates the regulators and it is his duty to insure that whatever excesses or arbitrary action may be indulged in by the Committee are curtailed. This check on the powers of The Florida Celery Committee appears to be an effective one.

### CONCLUSION

For the reasons stated above, it is thereupon

Ordered and adjudged that defendant A. J. Sullivan of Florida, Inc.'s motion to dismiss and the Secretary of Agriculture's motion for summary judgment be and the same are hereby granted. It is further

Ordered and adjudged that the plaintiffs' motion for summary judgment be and the same is hereby denied. Counsel shall promptly prepare and submit a final judgment form. Costs will be taxed by the Clerk.