Gloria HARRELL, Individually, and on behalf of her minor dependent children and on behalf of all others similarly situated

v.

John F. HARDER, Commissioner of Welfare, State of Connecticut.

Civ. No. 13800.

United States District Court,
D. Connecticut.

Jan. 11, 1974.

Mary R. Hennessey, Hartford, Conn., Elliot Taubman, Norwich, Conn., Francis X. Dineen, New Haven, Conn., Clarance Joseph Jones, New Haven, Conn.,

Roger E. Koontz, Stamford, Conn., Kevin T. Kane, Meriden, Conn., Allen Sims, New Haven, Conn., for plaintiff.

Francis J. MacGregor, Asst. Atty. Gen., East Hartford, Conn., for defendant.

## RULING ON MOTION FOR RELIEF FROM INJUNCTION

BLUMENFELD, Chief Judge.

This case, which began several years ago as a straight-forward effort to implement the Supreme Court's decision in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), has proven as difficult to dispose of as the legendary Hydra, provoking new issues as fast as old ones are resolved.[1]

The defendant's successor in office, Nicholas Norton, has now moved for additional relief, pursuant to Rule 60(b)(5) and (6) of the Federal Rules of Civil Procedure, from the order dated September 17, 1971, and the ruling dated June 13, 1973, and filed June 14, 1973, because HEW has issued new regulations governing fair hearing procedures[2] which purportedly are inconsistent with this Court's order and ruling. Full implementation of these new regulations would also require a modification of my order of April 30, 1970, entering a permanent injunction, and therefore I will assume the Motion for Relief to be directed at that order too.

## I.

## RELIEF FROM JUDGMENT OR ORDER UNDER RULE 60(b)(5) and (6)

Plaintiff argues at the outset that relief under Rule 60(b)(5) and (6)[3] is inappropriate in this case. It is

---

1. On April 30, 1970, soon after Goldberg v. Kelly was handed down, I entered a permanent injunction enjoining the Commissioner of Welfare of the State of Connecticut from terminating, reducing or suspending assistance to any recipient of aid under any of the state-administered categorical assistance programs established by the Social Security Act without providing prior notice and a pre-termination evidentiary hearing. (The categorical assistance programs include Aid to Families with Dependent Children (AFDC), Old Age Assistance (OAA), Aid to the Permanently and Totally Disabled (APTD), Aid to the Blind (AB), Medical Assistance (MA), and Food Stamp Benefits.) The Department of Health, Education and Welfare subsequently promulgated regulations governing the pre-termination fair hearing, codified at 45 C.F.R. § 205.10 (1972), and in deference to the Supreme Court's preference for administrative regulation rather than judicial control in this area, cf. Richardson v. Wright, 405 U.S. 208, 209, 92 S.Ct. 788, 31 L.Ed.2d 151 (1972), I vacated the permanent injunction and ordered the defendants to conform to the HEW regulations. The regulations, however, did not require a pre-termination hearing when the state agency determined that the reason for termination was "one of State agency policy, and not one of fact or judgment relating to the individual case, including a question of whether State agency rules or policies were correctly applied to the facts of the particular case." 45 C.F.R. § 205.10(a)(5)(iii).

Anticipating that the distinction between policy and fact would be difficult to discern in actual practice, and concerned that recipients not be severely disadvantaged by errors when made, see 397 U.S. at 261, 90 S.Ct. 1011, on September 17, 1971, I deleted one portion of the HEW regulations and gave the recipient the initial choice of classifying the decision. There followed a flood of motions for contempt by recipients whose benefits were terminated without a hearing by caseworkers who by mistake or inadvertence labeled the decision one of policy. Again seeking to finally resolve the matter, by ruling dated June 13, 1973, and filed June 14, 1973, I denied plaintiff's motion for contempt but ordered the Commissioner to use a specific printed form, which explicitly informed recipients that initial choices for classifying the decision were theirs, whenever the Commissioner intended to suspend, reduce, or terminate benefits to any recipient, or not to renew a recipient's food stamp certification.

2. The new regulations were issued in 38 F. R. 22005 et seq. on August 15, 1973, effective as of October 15, 1973.

3. Fed.R.Civ.P. 60(b)(5) and (6) provide, in pertinent part:
Rule 60. Relief from judgment or order.
 \* \* \* \* \*
 (b) On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

clear beyond doubt that the Court has the *power* to modify its orders to adapt to changed conditions. United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The crucial inquiry is whether conditions which existed at the time the order was entered have changed sufficiently to justify the modification. The Court of Appeals for this circuit has construed the applicable provision of Rule 60(b)(5) as follows:

> "The rule is not to be read without emphasis on the important words 'no longer'; assuming that the propriety of the injunction as issued has passed beyond debate, it refers to some change in conditions that makes continued enforcement inequitable."

Schildhaus v. Moe, 335 F.2d 529, 530 (2d Cir. 1964). Rule 60(b)(6) requires more than "some change in conditions that makes continued enforcement inequitable"; relief is justified only in the case of "extraordinary circumstances." Ackermann v. United States, 340 U.S. 193, 199, 71 S.Ct. 209, 95 L.Ed. 207 (1950); Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949).

 Plaintiff argues that a change in the *law* applicable to a case is not sufficient to justify relief under Rule 60(b)(5) or (6), Berryhill v. United States, 199 F.2d 217 (6th Cir. 1952); Title v. United States, 263 F.2d 28 (9th Cir.), cert. denied 359 U.S. 989, 79 S.Ct. 1118, 3 L.Ed.2d 978 (1959), and that the change in conditions in the instant case —the issuance of the new regulations by HEW—merely constitutes alterations in administrative regulations, providing even less justification for modification of the previous orders. Plaintiff's contention in this regard is open to some question, see 7 J. Moore, Federal Practice ¶ 60.27, at 359 (8th ed. 1971) and cases cited therein, but it is unnecessary to deal with the issue at length. *Berry-*

*hill, Title* and related cases involve changes in controlling decisional law occurring subsequent to entrance of the court's order. In the instant case, the decisional law upon which this Court's earlier orders are based, i. e., the Supreme Court's opinion in Goldberg v. Kelly, *supra,* has not changed. The changes in the HEW regulations are more akin to changes in the operative facts of the case: they set out new procedures to be used by the Connecticut State Welfare Department in deciding whether to terminate assistance to recipients, procedures which must ultimately be tested by the standards set out in *Kelly.* While these changes in departmental procedures may not constitute the "extraordinary circumstances" required for relief under Rule 60(b)(6), they are "changes in conditions" which may make continued enforcement of my earlier orders inequitable in certain respects, Schildhaus v. Moe, *supra,* and thus may be sufficient to justify relief under Rule 60(b)(5).

## II.

### THE NEW H.E.W. REGULATIONS

#### A. Requirements of Goldberg v. Kelly

As it has been from the beginning of this case, the central issue underlying these proceedings is the scope of the procedural protections which welfare recipients must be afforded prior to termination of assistance benefits under the Due Process Clause and the Supreme Court's ruling in Goldberg v. Kelly. In order to put the issues in the instant proceedings properly in perspective, it is first necessary to recall precisely what the Court said in Goldberg v. Kelly and what it did not say.

The welfare recipients in *Kelly* had brought suit to contest the termination or proposed termination of assistance without prior notice and hearing, in accordance with then-existing law. Subse-

---

\* \* \* \* \*

(5) . . . it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from operation of the judgment.

quent to the recipients' original filing in the district court, the State of New York and New York City adopted procedures for providing notice and hearing, and the recipients then challenged the constitutionality of those procedures.[4]

Fundamental to the force of the recipients' claims was the acknowledged difficulty of resolving—without any hearing at all or through an abbreviated procedure—questions of eligibility involving complex and often subtle factual determinations.[5] Thus the Court began by stating that the constitutional issue presented was "the narrow one whether the Due Process Clause requires that the recipient be afforded an *evidentiary* hearing *before* the termination of benefits." (First emphasis added, second emphasis in original).[6] Of course, the opportunity to participate in an *evidentiary* hearing prior to termination is only significant when factual matters are contested; when there is no dispute as to the relevant facts, an evidentiary hearing serves no purpose.[7]

The Court noted that there was no contention that welfare benefits were not sufficiently important interests to warrant protection by the Due Process Clause,[8] and the dispute was solely over the amount of process which was due. The Court stated that such a determination requires balancing the interests of the affected party, particularly the "extent to which he may be 'condemned to suffer grievous loss,' "[9] against the interests of the state ·in summary procedures. In the welfare context, however, the balance is tipped decidedly in favor of the recipient:

> "For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. . . . Thus the crucial factor in this context . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." (footnotes omitted.)[10]

In conjunction with the state's own interest in avoiding arbitrary or erroneous eligibility determinations,[11] these concerns were found to outweigh the state's interest in husbanding available fiscal and administrative resources:

> "Thus, the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the

---

4. 397 U.S. at 255–260, 90 S.Ct. 1011.

5. "During the course of this litigation most, though not all, of the plaintiffs either received a 'fair hearing' . . . or were restored to the rolls without a hearing. However, even in many of the cases where payments have been resumed, the underlying questions of eligibility that resulted in bringing of this suit have not been resolved. For example, Mrs. Altagracia Guzman alleged that she was in danger of losing AFDC payments for failure to cooperate with the City Department of Social Services in suing her estranged husband. She contended that the departmental policy requiring such cooperation was inapplicable to the facts of her case. The record shows that payments to Mrs. Guzman have not been terminated, but there is no indication that the basic dispute over her duty to cooperate has been resolved, or that the alleged danger or termination has been removed. Home Relief payments to Juan DeJesus were terminated because he refused to accept counseling and rehabilitation for drug addiction. Mr. DeJesus maintains that he does not use drugs. His payments were restored the day after his complaint was filed. But there is nothing in the record to indicate that the underlying factual dispute in his case has been settled." *Id.* at 256, n. 2, 90 S.Ct. at 1014.

6. *Id.* at 260, 90 S.Ct. at 1016.

7. Provisions of the proposed regulations which would preclude an evidentiary hearing prior to termination in particular, narrow circumstances are discussed in section II. B. 3. of this ruling, *infra*.

8. *Id.* at 261–262, 90 S.Ct. 1011.

9. *Id.* at 263, 90 S.Ct. at 1018.

10. *Id.* at 264, 90 S.Ct. at 1018.

11. *Id.* at 264–265, 90 S.Ct. 1011.

State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens. As the District Court correctly concluded, '[t]he stakes are simply too high for the welfare recipient, and the possibility for honest error or irritable misjudgment too great, to allow termination of aid without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal.' Kelly v. Wyman 294 F.Supp. 893 at 904–905."[12]

Accordingly, the Court held that prior to termination of welfare assistance, recipients must have "timely and adequate notice detailing the reasons for a proposed termination,"[13] an opportunity to present evidence at a hearing,[14] and "an opportunity to confront and cross-examine the witnesses relied on by the department," [15] with retained counsel if desired;[16] and the determination with respect to eligibility must be made by an impartial decisionmaker who must base his decision "solely on the legal rules and evidence adduced at the hearing."[17]

The opinion speaks in terms of general procedural requirements designed to protect basic constitutional rights: it does not purport to lay down specific requirements. Nowhere does it state that the pre-termination hearing must be held in any particular location, or that any particular number of days is the minimum "timely" advance notice constitutionally permissible. Indeed, in 42 U.S.C. § 1302 Congress has given the Secretary of the Department of Health, Education and Welfare "broad rule-making powers," Thorpe v. Housing Authority of Durham, 393 U.S. 268, 277 n. 28, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Connecticut State Department of Public Welfare v. Department of Health, Education and Welfare, Social and Rehabilitation Service, 448 F.2d 209, 213 (2d Cir. 1971). According HEW "the deference due the agency charged with the administration of the Act," Lewis v. Martin, 397 U.S. 552, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970), courts are properly loath—in the absence of conflicts with applicable statutes or infringements on constitutional rights—to substitute their own notions of what might constitute desirable procedures for those duly promulgated by the agency. See Richardson v. Wright, *supra*.[18]

## B. The Proposed Changes in the Court's Orders

The defendant Commissioner of Welfare specifically seeks five modifications in this Court's earlier orders in this case in accordance with the new HEW regulations. Each of the proposed modifications will be discussed in turn.

### 1. *Local Hearings*

Section 205.10(a)(1) of the new HEW regulations allows a state welfare de-

---

12. *Id.* at 266, 90 S.Ct. at 1019.

13. *Id.* at 267–268, 90 S.Ct. at 1020.

14. *Id.* at 268–269, 90 S.Ct. 1011.

15. *Id.* at 270, 90 S.Ct. at 1021.

16. *Id.* at 270, 90 S.Ct. 1011.

17. *Id.* at 271, 90 S.Ct. at 1022.

18. Plaintiff correctly notes that with respect to the relevant provisions of this Court's earlier orders, the new HEW regulations are permissive, not mandatory, and thus are technically not in conflict with those orders. Section 205.10(a)(1), for example, provides for a hearing before the state agency *or* an evidentiary hearing at the local level; thus the present requirement of a hearing before the state agency satisfies the regulation. Section 205.10(a)(4)(i) provides that notice, to be "timely" must be mailed *"at least"* ten days before the effective date of the termination. Thus the present requirement of fifteen days advance notice satisfies the terms of the new regulation. It is this Court's obedience to the Supreme Court's directive to allow "the administrative process . . . a reasonable opportunity to evolve procedures to meet needs as they arise," Richardson v. Wright, *supra*, however, rather than any perception of actual conflicts between my earlier orders and the new regulations, which prompts careful consideration of the propriety of allowing the new regulations to be implemented in Connecticut.

partment either to provide hearings before the state agency or to provide evidentiary hearings at the local level with a right of appeal to a state agency hearing.[19] Plaintiff challenges the provision on three grounds: that the statutory changes cited as authorization for the provision do not apply to the AFDC program; that the provision applies only to welfare systems making clear distinctions in administrative responsibilities between "local" and "state" agencies, such as that of New York, and not to unitary systems such as that of Connecticut, in which there is no such separation; and that the provision establishes new hearing procedures without adequate safeguards for the rights of recipients.

Commentary by HEW on the new regulations includes the statement, with respect to the local hearing provision, "This provision implements (and extends to title IV–A) section 407 of P.L. 92–603, under which local agencies 'may put into effect immediately upon issuance its decision upon the matter considered at such hearing.'" 38 F.R. 22005 (Aug. 15, 1973). Plaintiff correctly notes that Section 407 of P.L. 92–603 amends only §§ 2(a)(4), 1002(a)(4), 1402(a)(4), and 1602(a)(4) of the Social Security Act, does not amend § 402(a)(4) [42 U.S.C. § 602(a)(4)], and therefore does not by its terms pertain to the AFDC program.[20] Nevertheless, it is evident that even before passage of P.L. 92–603, 42 U.S.C. § 1302[21] conferred sufficient rule-making powers on the Secretary of HEW to enable him to implement provisions for local evidentiary hearings. Thorpe v. Housing Authority of Durham, *supra*, 393 U.S. at 277, n. 28, 89 S.Ct. 518 (1969); Connecticut State Department of Public Welfare v. Department of Health, Education and Welfare, Social and Rehabilitation Service, *supra*, 448 F.2d at 213; Almenares v. Wyman, 453 F.2d 1075, 1087–1088 (2d Cir. 1971), cert. denied 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); Arizona State Department

---

19. Section 205.10(a)(1) provides:
§ 205.10 Hearings.
(a) *State plan requirements.* A State plan under title I, IV–A, X, XIV, XVI or XIX of the Social Security Act shall provide for a system of hearings under which:
(1) The single State agency responsible for the program shall be responsible for fulfillment of hearing provisions which shall provide for:
(i) A hearing before the State agency, or
(ii) An evidentiary hearing at the local level with a right of appeal to a State agency hearing. Where a State agency adopts a system of evidentiary hearings with an appeal to a State agency hearing, it may, in some political subdivisions, permit local evidentiary hearings, and in others, provide for a single hearing before the State agency. Under this requirement hearings shall meet the due process standards set forth in the U.S. Supreme Court decision in Goldberg v. Kelly, 397 U.S. 254 (1970) and the standards set forth in this section.

20. The legislation which was ultimately enacted by Congress as P.L. 92–603 originally made its way through the legislative process as H.R. 1. The version of H.R. 1 which passed the Senate contained a proposed amendment to the Social Security Act, number 579(d) [Section 572(d) of H.R. 1] which would have amended the AFDC provisions to provide for local evidentiary hearings. Plaintiff has called the Court's attention to the fact that this amendment was dropped by the House-Senate Conference Committee. Conf.Rep.No.92–1605, 92d Cong., 2d Sess., p. 1. The Court notes, however, that H.R. 1 was a child born of political compromise, that amendment 579 was withdrawn along with a great many other Senate amendments in the Conference Report, and that the amendment was withdrawn by the Conference Committee without discussion or comment. In these circumstances, and in the absence of further elucidation as to Congressional intent, this Court is unwilling to infer that Congress specifically disapproved of the substance of proposed Section 572(d), or that it was opposed to the implementation of local evidentiary hearings for AFDC recipients.

21. 42 U.S.C. § 1302 provides:
The Secretary . . . of Health, Education and Welfare . . . shall make and publish such rules and regulations, not inconsistent with this Act, as may be necessary to the efficient administration of the functions with which [the Secretary] is charged under this Act.

of Public Welfare v. Department of Health, Education and Welfare, 449 F.2d 456, 467 (9th Cir. 1971), cert. denied 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972).[22]

■ Plaintiff's other two arguments against the provision are unpersuasive. Nowhere in Section 205.-10(a)(1) is there any mention of two distinct types of welfare programs—unitary state systems and dual "state"/"local" systems—nor is there any suggestion that the provision is inapplicable by its terms to unitary systems such as that of Connecticut. It is evident that the provision means just what it says: that the "single State agency responsible for the program" may provide *either* a "hearing before the State agency" *or* an "evidentiary hearing at the local level with a right of appeal to a State agency hearing." Further, it is clear that recipients' rights will be as adequately protected at local evidentiary hearings as they currently are at state level hearings. With respect to the requirement of hearings before the state agency or evidentiary hearings at the local level, Section 205.10(a)(1)(ii) specifically provides:

"Under this requirement hearings shall meet the due process standards set forth in the U.S. Supreme Court decision in Goldberg v. Kelly, 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287]

(1970) and the standards set forth in this section."

The procedural requisites delineated in Goldberg v. Kelly would, of course, be applicable to local evidentiary hearings even in the absence of such a provision in the regulations. Implementation of the new regulations may occasion procedural laxities or insufficiencies at the local level with which this Court should be concerned. Yet in view of the specific acknowledgement of the constitutional requirements and the express application of the additional relevant regulations to the local evidentiary hearings (and in the absence of any evidence in the record to the contrary), I find that there has been no adequate demonstration that deficiencies in the protection of recipients' rights at local evidentiary hearings would result from implementation of the new regulations.

*2. Reduction of "Timely" Notice Requirement From 15 Days to 10 Days*

■ Section 205.10(a)(4)(i) of the new regulations would reduce the period of notice prior to termination from 15 days to 10 days.[23] It is clear that the period of advance notice is of critical importance to the recipient, since Section 205.10(a)(6) provides that assistance will be continued until a decision is rendered after a hearing *only* if the recipient requests a hearing within the timely notice period. Yet it is equally

---

22. Examining the breath and scope of the rule-making power conferred on the Secretary of HEW by 42 U.S.C. § 1302, the court in Serritella v. Engelman, 339 F.Supp. 738, 752 (D.N.J.), aff'd per curiam 462 F.2d 601 (3d Cir. 1972), remarked, "A more plenary [grant] of rule-making power would be difficult to devise." In *Almenares* and *Serritella*, supra, the power of the Secretary to promulgate regulations requiring the pre-termination hearing to be conducted at the state level was upheld, and state regulations providing for pre-termination hearings at the local level were held invalid as being inconsistent with the federal regulations. Quite a different situation arises in the instant case, in which this Court now finds that the Secretary has the power to promulgate new regulations providing for evidentiary hearings at the local level with a right of appeal

to the State agency, but the underlying principle—the broad power of the Secretary to promulgate regulations pursuant to his statutory grant of authority—is the same.

23. Section 205.10(a)(4) provides, in pertinent part:

(4) In cases of intended action to discontinue, terminate, suspend or reduce assistance:

(i) The State or local agency shall give timely and adequate notice, except as provided for in paragraphs (a)(4)(ii) or (iii) of this section. Under this requirement:

(A) "Timely" means that the notice is mailed at least 10 days before the date of action, that is, the date upon which the recipient would normally receive his assistance check or, in the case of a medicaid recipient, 10 days before the intended change would be effective.

clear that 10 days' advance notice is not in itself objectionable on constitutional grounds: Goldberg v. Kelly held that New York City's provision for seven-day notice was not "constitutionally insufficient *per se*, although there may be cases where fairness would require that a longer time be given." 397 U.S. at 268, 90 S.Ct. at 1020. See Almenares v. Wyman, *supra*, 453 F.2d at 1079, n. 3. Nor would the new regulation conflict with the Social Security Act. See 42 U.S.C. §§ 302(a), 602(a), 1202(a), 1352(a), 1382(a), 1396a(a). Under these circumstances, as indicated above, considerations of administrative efficiency and sound judicial policy constrain deference to the duly promulgated regulations of the Secretary.

### 3. *Exceptions to the Timely Notice Requirement*

Section 205.10(a)(4)(ii) would allow the welfare agency to dispense with "timely" notice of termination of assistance (but not with "adequate" notice) in nine narrowly-defined situations.[24] Inasmuch as this procedure in these nine special situations (separately described in A through I, *infra*) would be a significant departure from current practices, raising important questions as to the due process requirements delineated in Goldberg v. Kelly, a closer analysis of the "timely notice" requirement is called for.

As noted earlier in this opinion, two factors were of particular importance in the Court's determination in Goldberg v. Kelly that a hearing was required before welfare assistance may be terminated: the possibility that agency termination decisions, involving disputed facts and subjective judgments, would be erroneous, and the "brutal" consequences facing the recipient in the wake of such an erroneous decision. As a general consideration, timely notice plays a significant role in the hearing process by providing the recipient with an opportunity to prepare to "argue for his livelihood,"[25] and to make adjustments for the possibility that assistance will be terminated. In the context of the HEW regulations, timely notice plays an even more critical role, since under Section

24. Section 205.10(a)(4) provides, in pertinent part:

(4) In cases of intended action to discontinue, terminate, suspend or reduce assistance:

\* \* \* \* \*

(ii) The agency may dispense with timely notice but shall send adequate notice not later than the date of action when:

(A) The agency has factual information confirming the death of a recipient or of the AFDC payee when there is no relative available to serve as new payee;

(B) The agency receives a clear written statement signed by a recipient that he no longer wishes assistance, or that gives information which requires termination or reduction of assistance, and the recipient has indicated, in writing, that he understands that this must be the consequence of supplying such information;

(C) The recipient has been admitted or committed to an institution, and further payments to that individual do not qualify for Federal financial participation under the State plan;

(D) The recipient has been placed in skilled nursing care, intermediate care or long-term hospitalization;

(E) The claimant's whereabouts are unknown and agency mail directed to him has been returned by the post office indicating no known forwarding address. The claimant's check must, however, be made available to him if his whereabouts become known during the payment period covered by a returned check;

(F) A recipient has been accepted for assistance in a new jurisdiction and that fact has been established by the jurisdiction previously providing assistance;

(G) An AFDC child is removed from the home as a result of a judicial determination, or voluntarily placed in foster care by his legal guardian;

(H) A change in level of medical care is prescribed by the recipient patient's physician;

(I) A special allowance granted for a specific period is terminated and the recipient has been informed in writing at the time of initiation that the allowance shall automatically terminate at the end of the specified period.

25. Comment, The Constitutional Minimum for the Termination of Welfare Benefits: The Need for and Requirements of a Prior Hearing, 68 Mich.L.Rev. 112, 131 (1969).

205.10(a)(6) assistance will be continued only if a hearing is requested within the timely notice period. If timely notice is dispensed with, assistance will *a fortiori* be discontinued on the date of action and, if the decision to terminate is found to be erroneous, will be resumed only after the hearing. Meanwhile the recipient is " 'cut off . . . in the face of "brutal need." ' " Goldberg v. Kelly, 397 U.S. at 261, 90 S.Ct. at 1017.

The factors which dictate when timely notice is required also indicate when the requirement is not applicable. The pre-termination procedural requirements have "one function only: to produce an initial determination of the validity of the welfare department's grounds for discontinuance of payments in order to protect a recipient against an erroneous termination of his benefits." Goldberg v. Kelly, 397 U.S. at 267, 90 S.Ct. at 1020. Thus, if dispensing with timely notice (and, perforce, discontinuing assistance before the hearing) will neither affect the likelihood of the agency's rendering an erroneous decision nor subject the recipient to "brutal need," the necessity for provision of such notice is eliminated. *Cf.* Merriweather v. Burson, 325 F.Supp. 709, 710–711 (N.D.Ga.1970), aff'd in part 439 F.2d 1092 (5th Cir. 1971); Velazco v. Minter, 481 F.2d 573, 578 (1st Cir. 1973). The "nine exceptions" in the new HEW regulations must therefore be measured against these two considerations.

A. *Death of Recipient or Payee* [26]

When the agency has factual information confirming the death of the recipient, it is difficult to perceive any way in which dispensing with timely notice will affect the accuracy of the decision to terminate assistance. There are no subtleties involved in factually confirming the death of a recipient. Unless this Court is to assume bad faith on the

part of the agency, which it is unwilling to do, it is difficult to see how such a determination can be subject to ambiguity. Of course, if the recipient is deceased, termination of assistance will have no harmful effects (and as a matter of administrative policy should be accomplished as soon as possible).

When the agency has factual information confirming the death of the AFDC *payee* when there is no relative available to serve as new payee, the situation is no less unambiguous. The typical case involves the death of an AFDC-payee mother, and the concern focuses on the continuation of benefits to her recipient-children. Generally, the agency learns of the death from a relative or neighbor. It then follows a standard procedure in providing for the children. The agency determines after investigation by a caseworker whether there is an "eligible relative" to serve as the new payee, the determination being made according to prescribed agency guidelines. State Welfare Department Policy Manual, Vol. 1, Index No. 262. If there is an "eligible relative" available, assistance is continued with the eligible relative being designated as the new payee. In the rare instances where there is no eligible relative available, the agency arranges for the children to be placed under foster care. Again, it is difficult to see any threat to the subsistence of the children in this situation, and the need for timely notice does not appear to be urgent. The agency decision whether there is an "eligible relative" is a clear-cut factual determination, made according to established guidelines. If an eligible relative is available, assistance will continue with the relative as the new payee. If no eligible relative is available, assistance will continue through the state-appointed foster parent. Any possible reduction in assistance payments would only result from the substitution of the Department's foster care rate for the normal assistance rate in payments

26. A "recipient" is a person who receives welfare benefits. A "payee" is a person to whom an assistance check is made out. In a family consisting of a mother and three children, the mother is the payee and the mother and the children are all recipients.

to the foster parent payee. State Welfare Department Policy Manual, Vol. 1, Policy 5030, p. 14, item 8; State Welfare Department Policy Manual, Vol. 1, Index 165, p. 2. The recipient-children, however, will not suffer thereby.

B. *Written Statement By Recipient*

█ Where the agency receives a clear written statement signed by the recipient that she no longer wishes assistance, or, alternatively, receives a statement that gives information which requires termination or reduction of assistance, and the recipient has indicated in writing that she understands that this must be the consequence of supplying such information, the possibility of agency error in the decision whether to terminate is minimal if not non-existent. It is imperative, of course, that the written statement in the first situation be "clear": it must *specifically* refer to the discontinuance, termination, suspension, or reduction of assistance; the intention of the recipient must be manifest; and the import of the statement must be plain and unambiguous. The recipient in the second situation must truly "understand" the consequences of her act: such understanding must be a reasonable comprehension that assist-

ance will be terminated as a matter of law as a result of her supplying the information. Needless to say, such statements must be voluntary and not coerced in any way. When the agency has received a statement meeting these requirements, timely notice of termination would not appear to serve any purpose.[27]

C, D. *Admission to Institution*

█ The third and fourth exceptions to the timely notice requirement listed in Section 205.10(a)(4)(ii) involve situations where the recipient has been admitted or committed to an institution, and further payments to that individual do not qualify for federal financial participation under the state plan, and where the recipient has been placed in skilled nursing care, intermediate care or long-term hospitalization. Recipients covered by these provisions are those admitted to public non-medical institutions,[28] public and private mental institutions,[29] and public and private medical institutions.[30] The possibility of factual error in the Department's decision-making in these situations appears to be minimal. In all of these situations, the Department does not consider reducing or suspending benefits until it has received factual confirmation of

27. The issue of whether the recipient will be subjected to "brutal need" does not arise, since the recipient is voluntarily and intentionally withdrawing from welfare assistance.

28. The Connecticut State Welfare Department Policy Manual, Vol. I, Index Nos. 230 and 231 provides that benefits under the Old Age Assistance, Aid to the Blind, and Aid to the Disabled categorical assistance programs shall be available to eligible persons admitted to private non-medical institutions, though not to such persons admitted to public non-medical institutions. Upon inquiry to Mrs. Caroline Packard, who testified at the hearing and who is Chief of the Policy Department of the Connecticut State Welfare Department, the Court has determined that the Welfare Department would exempt from the provisions of Section 205.10(a)(4)(ii)(C) and (D) all persons eligible for OAA, AB, and AD who are admitted to private non-medical institutions since it is not true that "further payments to [these persons] do not qualify for Federal financial participation under the State

plan": such individuals would receive timely notice before assistance could be discontinued, terminated, suspended, or reduced. Persons similarly eligible who are admitted to *public* non-medical institutions would not receive timely notice, but they are not eligible for assistance in any case. The distinctions between public non-medical institutions and private non-medical institutions are set out with sufficient clarity in Index 231 that the possibility of error in classifying any particular institution is minimal.

29. *See* State Welfare Department Medical Manual, Vol. 3, Chap. 9, Supp. D–2, No. D–221; State Plan for Medical Assistance, Supp. D, p. 9–E. Department policy is that recipients over age 65 who are admitted to public mental institutions are still available for federally-sponsored assistance and consequently are excluded from exceptions (C) and (D). Those under 65 who are so admitted are included within the exceptions.

30. *See* State Welfare Department Medical Manual, Vol. 3, Index Nos. 300, 301.2.

the admission or commitment to the institution. This is provided either by other members of the recipient's family, friends, or the institution itself.[31]

More important than the unlikelihood of factual error in the decision whether to terminate assistance in these situations is the fact that recipients who are terminated (even in the remote possibility that they are terminated erroneously) would not be subject to "brutal need," since by the terms of the exceptions such persons would be under medical or other institutional care. If by chance a factual question did arise necessitating a hearing, such care would sustain the recipient until a final decision could be rendered.

E. *Recipient's Whereabouts Unknown*

■ Mrs. Packard testified at the hearing that Department policy is to wait until two checks are returned by the post office before taking action against a recipient. This appears to afford recipients more protection than is provided by the exception, which by its terms apparently becomes operable when the first check is returned. At any rate, the likelihood that an eligible recipient still residing in Connecticut will fail to receive two checks is so small that the possibility of factual error, or the subjection of an eligible recipient to harsh deprivation, appears to be minimal.

F. *Recipient Accepted in New Jurisdiction*

■ This provision would have no effect upon Department policy in Connecticut, since Index 222 of the Welfare Department Policy Manual indicates that assistance is terminated immediately upon the Department's receiving confirmation of the recipient's permanent change of residence with intent to establish residence in another state.

G. *Child Removed From Home*

■ Similar to the situation in which a recipient has died, there are no subtleties involved in factually determining whether a child has been removed from the home as a result of a judicial determination or voluntarily placed in foster care by his legal guardian. Once the removal of the child has been confirmed, reduction of assistance by the amount of the child's allotment will not subject the *remaining* members of the family to "brutal need."

H. *Change in Medical Care*

■ Upon inquiry the Court has determined that under Department procedures, assistance is only reduced if the attending physician files a signed statement with the Department confirming that a change in level of medical care had been prescribed. This procedure would appear to adequately protect the recipient from factual errors in the decision to reduce benefits and from the possibility that such reduction would cause undue hardship.

I. *Special Allowance for Specific Period*

■ Of all the exceptions, this one appears the least likely to impose hardship on a recipient on account of elimination of timely notice. Not only is the special allowance solely for a specified period of time, but the recipient *has had written notice at the time of initiation* that the allowance would automatically terminate at the end of the specified period.

■ In summary, it appears that the situations described in these exceptions are so narrowly circumscribed that the possibility of factual error in the decision whether to terminate direct payment of benefits is virtually nonexistent. The exceptions also appear to pertain to situations in which the recipient will not be subject to a withdrawal of funds upon which she depends for her very subsistence. As noted above, Goldberg v. Kelly requires that *only* if elimination of timely notice (and discontinuance of assistance before the hearing) will *nei-*

---

31. Public and private medical institutions notify the Department of all admissions of welfare recipients by means of the Department's Form 285.

*ther* affect the likelihood of the agency's rendering an erroneous decision *nor* subject the recipient to "brutal need" may such notice be dispensed with. Since the exceptions in the new HEW regulations appear to meet these requirements, I find that notice may be dispensed with under the narrow conditions thus delineated.

■ This Court is not unaware of the "welfare bureaucracy's difficulties in reaching correct decisions on eligibility" noted in Goldberg v. Kelly, *supra*, 397 U.S. at 264, n. 12, 90 S.Ct. 1011. An article cited by the Court in Goldberg v. Kelly, *id.*, presents significant statistics:

> "Thus the court in Kelly v. Wyman noted that for the period April through August, 1968, only 64% of the decisions to discontinue benefits in New York State were affirmed at later hearings. 294 F.Supp. 893 at 901 n. 17 (S.D.N.Y.1968). In Texas, the reversal rate apparently averages around 55%. Bell & Norvell, Texas Welfare Appeals: The Hidden Right, 46 Texas L.Rev. 223, 224 (1967). 'Another general index of the validity of terminations is provided by the Office of Economic Opportunity: "80% of 200 decisions cutting clients off public assistance were reversed" by attorneys in O.E.O. legal services offices.' 115 U.Pa.L.Rev., supra note 42, at 1312 n. 31."

Comment, Due Process and the Right to a Prior Hearing in Welfare Cases, 37 Fordham L.Rev. 604, 611 n. 47 (1969). These same "difficulties" were recently noted by Mr. Justice Brennan, dissenting in Richardson v. Wright, *supra*, 405 U.S. at 221, 92 S.Ct. at 795:

> "Finally, the post-termination reversal rate for disability determinations makes the asserted 'objectivity' even more doubtful. According to the Secretary's figures for 1971, 37% of the requests for reconsideration resulted in reversal of the determination

that disability had ceased. Moreover, 55% of the beneficiaries who exercised their right to a hearing won reversal. While, as the Secretary says, these figures may attest to the fairness of the system, Richardson v. Perales, *supra*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 at 410, they also appear to confirm that the Court's reference in *Goldberg* to 'the welfare bureaucracy's difficulties in reaching correct decisions on eligibility,' 397 U.S., at 264 n. 12, 90 S.Ct. 1011, is fully applicable to the administration of the disability program."

See also Yee-Litt v. Richardson, 353 F. Supp. 996, 1000–1001 (N.D.Cal.), aff'd sub nom. Carleson v. Yee-Litt, 412 U.S. 924, 93 S.Ct. 2753, 37 L.Ed.2d 152 (1973). Accordingly, while this Court endeavors to respect the Supreme Court's preference for administrative regulation rather than judicial control in this area, it will be quick to act if it develops that issues of fact are raised in specific cases by any of the situations covered by the exceptions, or if in any particular instance such a situation results in subjection of a recipient to the agony of destitution. And this Court's earlier orders are only modified and are not vacated by this ruling. As an additional safeguard of the rights and interests of recipients, the Court will require that when facts in a particular case appear to fall within one of the listed "exceptions," such facts must be independently reviewed by an employee of the Welfare Department other than the individual recipient's caseworker, and *certified as accurate* by that second individual by written statement *before* action is taken to suspend, discontinue, terminate or reduce assistance payments.

4. *Change in Deadline for Final Administrative Action*

■ Section 205.10(a)(16) would allow 90 days for a final fair hearing decision rather than the present 60 days.[32] Plaintiff correctly notes that a 90-day

---

32. Section 205.10(a)(16) provides:
 (16) Prompt, definitive, and final administrative action shall be taken within 90 days from the date of the request for a hearing.

limit would be inconsistent with Connecticut law. Conn.Gen.Stats. §§ 17–2a, 17–2b. It would therefore be inappropriate for this Court to modify its earlier rulings in order to allow implementation of the 90-day limit provision of the new HEW regulations.

### 5. *Additions to Required Form*

Finally, the defendant seeks to make two additions to the printed form ordered to be used by the Welfare Department by this Court in its Ruling dated June 13, 1973, and filed June 14, 1973. The defendant seeks to add a paragraph to the form "notifying recipients that they are liable to reimburse the agency if the hearing result supports the original agency decision." In addition, he would add a paragraph describing the nine instances where only adequate notice, and not timely notice, is required prior to suspension, discontinuance, termination, or reduction in assistance payments.

With respect to the first proposed addition, the plaintiff notes that specific provisions authorizing recoupment from current assistance payments have been held violative of the Social Security Act, Cooper v. Laupheimer, 316 F.Supp. 264 (E.D.Pa.1970); Bradford v. Juras, 331 F.Supp. 167 (D.Or.1971), and urges the requested addition would be inappropriate if not illegal.

■ Section 233.20(a)(12) of the new HEW regulations provides *inter alia* that the state may recoup overpayments from current assistance payments as long as the reductions in assistance are within "reasonable limits" and do not "cause undue hardship on recipients." [33] The cases in which recoupment provisions were struck down both rested on the same rationale. Both involved provisions allowing recoupment from current AFDC payments. Both courts noted that the central purpose of the AFDC program is the welfare and protection of the needy dependent child. Cooper v. Laupheimer, *supra*, 316 F. Supp. at 268; Bradford v. Juras, *supra*, 331 F.Supp. at 170. See 42 U.S.C. § 601; King v. Smith, 392 U.S. 309, 313, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). This purpose is thwarted when an otherwise eligible *child* is denied benefits be-

---

33. Section 233.20(a)(12) provides:

§ 233.20 Need and amount of assistance.
(a) *Requirements for State plans.*
\* \* \*

\*　　\*　　\*　　\*　　\*

(12) *Recoupment of overpayments and correction of underpayments.* Specify uniform Statewide policies for:
(i) Recoupment of overpayments of assistance, including overpayments resulting from assistance paid pending a hearing decision; Under this requirement:
(A) The State may recoup any overpayment (election by the State not to recoup overpayments shall not waive the provisions of §§ 205.40, 205.41 or any other quality control requirement);
(B) Except where there is evidence which clearly establishes that a recipient willfully withheld information about his income and resources, recoupment shall be limited to overpayments made during the 12 months preceding the month in which the overpayment was discovered;
(C) The plan may provide for recoupment from available income and resources (including disregarded, set-aside or reserved items) or from current assistance payments or from both; and

(D) If the recoupments are made from current assistance payments, the State shall establish reasonable limits on the proportion of such payments that may be deducted, so as not to cause undue hardship on recipients.
(E) The plan may provide for recoupment in all situations or in specified circumstances and for waiver of the overpayment where the cost of collection would exceed the amount of the overpayment.
(ii) Prompt correction of underpayments to current recipients, resulting from administrative error where the State plan provides for recoupment of overpayments. Under this requirement:
(A) Retroactive corrective payment shall be made only for the 12 months preceding the month in which the underpayment is discovered;
(B) For purposes of determining continued eligibility and amount of assistance, such retroactive corrective payments shall not be considered as income or as a resource in the month paid nor in the next following month; and
(C) No retroactive payment need be made where the administrative cost would exceed the amount of the payment.

cause his *parent* mistakenly or fraudulently obtained an overpayment at some time in the past.[34] Bradford v. Juras, *supra*, 331 F.Supp. at 170–171; Cooper v. Laupheimer, *supra*, 316 F.Supp. at 268–269.

> "The state has a legal right to recover from the mother funds which she was not entitled to receive but it cannot recover these funds by reducing current assistance to the child. The target and primary beneficiary of AFDC aid is the child; the mother is merely the conduit through which the funds are channeled to the child. The Pennsylvania regulation does not exact restitution solely from the mother's share because no specific percentage of an AFDC grant is designated for the mother's sole benefit. Thus, the money withheld from the current grant is withheld from the eligible child."

*Id.* at 269. Recoupment provisions which permit reduction of payments needed by the child thus violate the Social Security Act, 42 U.S.C. §§ 601, 602(a)(10). Not all recoupment provisions, however, violate the Act. In Holloway v. Parham, 340 F.Supp. 336 (N.D.Ga.1972), plaintiffs challenged the Georgia recoupment statute, Ga.Code Ann. § 99–2912(b), which provided:

> "(b) Any person who obtains any payment of public assistance to which he is not entitled, or in excess of that to which he is entitled, shall be liable to repay such sum, or if continued on assistance shall have future grants proportionately reduced until the excess amount received has been repaid. In any case in which, under this section, a person is liable to repay any sum, such sum may be collected without interest by civil action brought in the name of the Department of Family and Children Services of the State of Georgia. Any repayment required

by this subsection *may, in the discretion of the Director of the Department of Family and Children Services, be waived in whole or in part, upon a finding by the Director of the Department of Family and Children Services that such repayment would deprive such person, his spouse, parent, or child of shelter or subsistence needed to enable such person, spouse, parent, or child to maintain a minimum standard of health and well-being."* (Emphasis added).

The court noted that in accordance with the applicable provisions of Georgia law, Ga.Code Ann. § 102–103, "may" would be construed to mean "must" or "shall." 340 F.Supp. at 343. The Director was therefore *required* to waive repayment where the consequent reduction in assistance benefits would deprive any parent or child "of shelter or subsistence needed to enable such person . . . to maintain a minimum standard of health and well-being." This construction of the state statute saved the recoupment provision from conflict with the federal Act:

> ".Thus, the statute requires the Director to exercise his discretion by considering the *need* of dependent children before recouping overpayments in AFDC.
>
> Since this construction of Ga.Code Ann. § 99–2912(b) requires the Director to waive repayment if there is *need,* it does not allow restitution from *needy* dependent children for the misconduct of their parents. Thus, Ga.Code Ann. § 99–2912(b) is consistent with the provisions of the Social Security Act [42 U.S.C. § 602(a)(10)]."

*Id.*

■■■ The new HEW regulations do not permit recoupment from current assistance payments if the deductions are beyond "reasonable limits" or if such de-

---

34. The Social Security Act, 42 U.S.C. § 602(a)(10) requires state plans for aid and services to needy families with children to provide "that aid to families with dependent children shall be furnished with reasonable

promptness to *all* eligible individuals." (Emphasis added). The Secretary of HEW may withhold federal payments to any state for noncompliance with this requirement. 42 U.S.C. § 604(a)(2).

ductions would "cause undue hardship on recipients." While these terms admit of some latitude in interpretation, they certainly impose upon the defendant Commissioner a restriction comparable to that imposed by the Georgia statute: recoupment from current assistance payments is clearly unreasonable, and obviously causes undue hardship, if it deprives any parent or child of the shelter or subsistence needed to enable such person to maintain a minimum standard of health and well-being, Goldberg v. Kelly, *supra*. Under this construction, therefore, Section 233.20(a)(12) of the new regulations does not authorize recoupment "if there is *need*," and consequently "does not allow restitution from *needy* dependent children for the misconduct of their parents." Thus under this construction the recoupment provisions of the new HEW regulations do not conflict with the Social Security Act, 42 U.S.C. §§ 601, 602(a)(10).

■ Nevertheless, that the new regulations are not necessarily in conflict with the federal Act is no reason for adding the proposed paragraph to the printed welfare form. The defendant has failed to present any justification for the proposed addition. Welfare recipients are liable to reimburse the state for all monies they have received, Conn. Gen.Stats., § 17–83e, and are notified of this obligation at the time of application for assistance. This Court is unwilling to assume an improper motive on the part of the defendant, but neither does it discern any reason for adding the proposed paragraph. Accordingly, the request to add a paragraph concerning possible recoupment of assistance payments is denied.

■ The proposed paragraph describing the nine instances where only *adequate* notice is required would be an inappropriate addition to the presently required printed welfare form. By its nature that form is designed to apprise recipients of pending terminations of benefits in order that they may request fair hearings, a function which is inconsistent with the rationale underlying the nine exceptions to the timely notice requirement. It *is* critically important for recipients to be made aware from the very beginning that in the nine narrowly-defined situations they will not receive notice prior to termination of benefits. This notice should be given to all applicants at the time of their application for assistance. Of course, they must also be informed at that time that if they dispute the facts upon which the departmental decision to terminate benefits is based, they may request a fair hearing in order to vindicate their claims.

Accordingly, the earlier orders and rulings of this Court are modified as specified herein, and it is hereby

Ordered that the defendant Commissioner may implement Sections 205.-10(a)(1), 205.10(a)(4)(i), and 205.-10(a)(4)(ii) of the new HEW regulations in accordance with the considerations and procedural safeguards provided herein,[35] and it is further

Ordered that defendant Commissioner shall provide that persons applying for welfare benefits shall be notified of the nine exceptions to the timely notice requirement at the time of application for benefits.

35. See pp. 818–823, *supra*.